349 Conn. 67          MAY, 2024          67

Markley *v.* State Elections Enforcement Commission

## JOE MARKLEY ET AL. *v.* STATE ELECTIONS ENFORCEMENT COMMISSION
### (SC 20726)

Robinson, C. J., and McDonald, Mullins, Ecker and Alexander, Js.

*Syllabus*

The plaintiffs, M and S, candidates for state legislative offices in the 2014 general election, appealed to the trial court from the decision of the defendant, the State Elections Enforcement Commission, which assessed fines against the plaintiffs upon determining that they had violated certain state statutes and regulations governing campaign financing and the Citizens' Election Program (program) (§ 9-700 et seq.). The plaintiffs' respective campaign committees had each applied for and received public funding grants through the program. During the 2014 election cycle, the plaintiffs' campaign committees published certain communications and advertisements that made various references to the record and policies of D, then the governor, who was running for reelection at that time. The communications both touted the plaintiffs' respective accomplishments and positions and referred to their opposition to the agenda advanced by D and D's Democratic allies, including tax hikes and increased spending. One of the communications highlighted votes taken by S's opponent in the 2014 election, C, when C was serving as a state representative. C filed a complaint with the commission, alleging that the communications were impermissible campaign expenditures under the program. C relied on an advisory opinion previously issued by the commission, in which it interpreted the statutes (§§ 9-601b and 9-607 (g)) defining the term "expenditure" and governing the permissibility of campaign expenditures, as well as the state regulations (§§ 9-706-1 and 9-706-2) implementing the program, and concluded that, in the absence of a statutory exception to the definition of "expenditure," funds in a candidate committee's account may not be used to make a communication that is not directly related to the candidate's own electoral race and that also promotes the defeat of or attacks a candidate who is not a direct opponent of the candidate sponsoring the communication but who is running in a different race. After a hearing, the commission found that the plaintiffs had violated the applicable statutes and regulations by using their candidate committee funds to pay for communications that criticized D in the course of promoting their opposition to D's policies. On appeal to the trial court, the plaintiffs claimed that the statutes and regulations imposing expenditure limitations as a condition of receiving public funding violated their rights under the first amendment to the United States constitution by restricting their ability to speak about other, nonopposing candidates. The trial court agreed with the commission's conclusion that the plaintiffs had

Markley *v.* State Elections Enforcement Commission

violated the applicable statutes and regulations, insofar as the communications constituted the functional equivalent of express advocacy for the defeat of D in his reelection bid, and the trial court further concluded that the program constituted a valid, alternative route by which the plaintiffs voluntarily had elected to exercise their first amendment rights and that the program's conditions did not abridge those rights. Accordingly, the trial court rendered judgment upholding the commission's decision, from which the plaintiffs appealed. On appeal, the plaintiffs claimed, inter alia, that the commission's enforcement of the applicable statutes and regulations to preclude publicly funded candidates from using their candidate committee funds to pay for campaign communications, which, as a rhetorical device, invoke the name of a candidate in a different electoral race to refer more broadly to the policies or political party associated with that candidate, violated their first amendment rights.

*Held* that the commission's enforcement of the applicable statutes and regulations in accordance with its advisory opinion imposed an unconstitutional condition in violation of the first amendment to the extent that it penalized the plaintiffs for mentioning D's name in a manner that was not the functional equivalent of speech squarely directed at D's reelection campaign, and, accordingly, this court reversed the trial court's judgment and remanded the case with direction to sustain the plaintiffs' administrative appeal:

Following an examination of the United States Supreme Court's decisions considering the constitutionality of various campaign finance reform laws under the first amendment and a discussion of the unconstitutional conditions doctrine, pursuant to which the government may not deny a benefit to a person on a basis that infringes his or her constitutionally protected freedom of speech, even if that person is not otherwise entitled to such a benefit, this court observed that, although laws that burden political speech, including expenditure limitations, ordinarily are subject to strict scrutiny, candidates who voluntarily accept public campaign funding also accept reasonable terms and conditions attendant to such programs that otherwise may abridge their free speech rights.

Nevertheless, the fact that a candidate voluntarily participates in a government program is not dispositive of the first amendment issue, when, as in the present case, the program restrictions at issue are not generalized expenditure limits but, rather, directly govern the specific content of a publicly financed candidate's communications, and, because public campaign financing laws that restrict political expression operate to burden a candidate's core first amendment speech, the court must look beyond voluntariness and apply strict scrutiny to determine whether the restrictions are narrowly tailored to achieve the traditional goals of public campaign financing, namely, promoting participation in the campaign financing program, reducing fundraising burdens and the corrupting

Markley *v.* State Elections Enforcement Commission

effects of contributions and the pursuit of contributions on government decision making, facilitating candidate communications with the electorate, and protecting the fiscal integrity of the program.

Prohibiting publicly funded candidates from engaging in campaign speech concerning other electoral races survives strict scrutiny if it is narrowly tailored to protect the public fisc by enforcing the limitations of the program, and limitations on campaign speech that refer to a candidate in another race are narrowly tailored to achieve that compelling state interest only when the speech at issue is unquestionably the functional equivalent of express advocacy or campaign speech concerning the candidate involved in the other race, rather than a rhetorical device intended to communicate where the speaker stands on the issues.

Moreover, this court recognized that candidates must be able to communicate where they stand on issues in relation to other candidates and public officials, and invoking prominent political figures by name will sometimes provide the most meaningful and effective way for a candidate to explain to voters their political ideals, policy commitments, and the values they hope to bring to the office they seek, even if some of those political figures may happen to be candidates elsewhere on the ballot in a particular election, and the rhetorical value of being able to categorize oneself in relation to other political candidates is especially great in state legislative races.

Nonetheless, the commission could apply the standard articulated in its advisory opinion to preclude publicly funded candidates from using committee funds to promote the defeat of or to attack a candidate who is not a direct opponent of the candidate sponsoring the communication but who is engaged in a different electoral race, as that standard was not, on its face, an unconstitutional condition in violation of the first amendment, to the extent that it ensured that public funds are spent only on qualifying campaigns without exceeding the amount of the grant allotted per race, but, if that standard is applied in a way that muzzles a publicly funded candidate's political speech beyond that necessary to prevent the funding of campaign speech with respect to a clearly identified candidate running in a different electoral race, it is a content based restriction that is an unconstitutional condition in violation of the first amendment.

In determining whether campaign communications by a publicly funded candidate who uses the name of a candidate engaged in a different electoral race as a rhetorical device to refer to a set of policies opposed or supported by the publicly funded candidate constitutes impermissible electoral communications, rather than a constitutionally protected message in direct furtherance of the publicly funded candidate's own campaign for office, this court relied on the opinion announcing the judgment of the United States Supreme Court in *Federal Election Commission* v.

Markley *v.* State Elections Enforcement Commission

*Wisconsin Right to Life, Inc.* (551 U.S. 449), which held that a court should find that a campaign communication is the functional equivalent of express advocacy of election or defeat of a candidate, rather than permissible discussion of issues and candidates who are intimately tied to public issues, only if the communication is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.

Furthermore, the functional equivalent of express advocacy standard is objective and focuses on the substance of the communication rather than on its effect or considerations of the speaker's intent to affect the election, and, although the distinction between permissible discussion of issues and candidates, on the one hand, and prohibited advocacy of election or defeat of candidates, on the other, may often dissolve in practical application, the functional equivalency standard gives the benefit of the doubt to protecting rather than stifling speech, such that, when the first amendment is implicated, the tie goes to the speaker rather than the censor.

With respect to the communications and advertisements at issue, this court concluded that they were not the functional equivalent of express advocacy with respect to D's reelection, insofar as they could not reasonably be construed as anything more than a rhetorical device intended to communicate the merits of the plaintiffs' candidacies as bulwarks against the policies endorsed by D and his Democratic allies.

Three of the communications at issue revealed nothing that rendered them the functional equivalent of express advocacy with respect to D's reelection, as they lacked any express references thereto, did not suggest that a vote for C would be tantamount to a vote for D or Democratic Party policies, and did not indicate in any way that D was running for reelection in 2014 or that support for the plaintiffs would be integral to defeating the candidacy of D or any other Democrat seeking office, and, instead, those communications highlighted the plaintiffs' role as a legislative check and balance against policies endorsed by D and his Democratic allies, such that the communications did not convey a different meaning in 2014, when D was running for reelection as an incumbent, than they would have conveyed during the 2012 or 2016 midterm election cycles, when D was simply serving as the governor.

Although the remaining two communications presented a closer question, insofar as they either used words somewhat evocative of an ongoing negative campaign against D, such as promoting a new direction and imploring voters to "change course" and stop D's agenda, or expressly referred to D's campaign for governor, this court could not concluded that those communications were the functional equivalent of express advocacy with respect to D's reelection because they reasonably might be understood as urging electoral resistance to the leadership and initia-

Markley *v.* State Elections Enforcement Commission

tives of D and his Democratic allies, and, to the extent that the references to "change" and a "campaign" could be understood to be the functional equivalent of express advocacy, the tie went to the speakers, that is, the plaintiffs.

Argued September 13, 2023—officially released May 21, 2024

*Procedural History*

Appeal from a decision of the defendant finding the plaintiffs in violation of state election laws and regulations, brought to the Superior Court in the judicial district of New Britain, where the court, *Joseph M. Shortall*, judge trial referee, granted the defendant's motion to dismiss and, exercising the powers of the Superior Court, rendered judgment dismissing the action, from which the plaintiffs appealed; thereafter, this court reversed the trial court's judgment and remanded the case for further proceedings; subsequently, the case was and tried to the court, *Hon. Joseph M. Shortall*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment affirming the decision of the defendant, from which the plaintiffs appealed. *Reversed*; *judgment directed*.

*Charles Miller*, pro hac vice, with whom were *Mario Cerame* and, on the brief, *Adam J. Tragone*, pro hac vice, for the appellants (plaintiffs).

*Maura Murphy Osborne*, deputy associate attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (defendant).

*Opinion*

ROBINSON, C. J. This appeal presents an issue of first impression under the first amendment to the United States constitution, namely, the extent to which the statutes and regulations governing the public funding of state elections in connection with the Citizens' Election Program (program), General Statutes § 9-700 et seq., may be applied to preclude publicly funded candidates

Markley *v.* State Elections Enforcement Commission

from using their candidate committee funds to pay for campaign advertisements that, as a rhetorical device, invoke the name of a candidate in a different race to refer more broadly to the policies or political party associated with that candidate. The defendant, the State Elections Enforcement Commission (commission), imposed fines on the plaintiffs, Joe Markley and Rob Sampson, who were publicly funded candidates for state legislative office during the 2014 general election cycle, on the ground that they had violated the statutes and regulations governing the program when they utilized their candidate committee funds to pay for communications that criticized then Governor Dannel Malloy, who was seeking reelection to that office in that same election cycle, in the course of promoting their opposition to his policies. The plaintiffs now appeal[1] from the judgment of the trial court upholding the decision of the commission, claiming that the commission's enforcement of the state election laws in that manner violated their first amendment rights. Although a compelling governmental interest is served by a condition that precludes publicly funded candidates from using program funds to support or oppose candidates in other races, we conclude that the commission violated the plaintiffs' first amendment rights with respect to the five advertisements at issue in this case because they could reasonably be understood to be something other than an appeal to vote against Governor Malloy. Accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed facts and procedural history. During the 2014 general election cycle, Markley was an unopposed candidate for state senator from the Sixteenth Senatorial District and registered the candidate committee "Joe Markley for State

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Markley *v.* State Elections Enforcement Commission

Senate 2014.'' Sampson, who was an incumbent state representative from the Eightieth General Assembly District, was seeking reelection to that office during the 2014 general election cycle and registered the candidate committee ''Sampson for CT.'' Sampson's opponent in that race was John ''Corky'' Mazurek, who is the complainant before the commission in this case. Each of the plaintiffs' campaign committees applied for and received public funding grants from the program, Markley in the amount of $56,814, and Sampson in the amount of $27,850.

During the 2014 general election cycle, the plaintiffs published five communications or advertisements that are at issue in this appeal. The first communication, exhibit 2 before the commission, was a large, double-sided postcard, jointly paid for by the plaintiffs' respective committees, the back side of which stated that the plaintiffs ''are who we need to turn Connecticut around!'' In addition to touting the plaintiffs' work as state legislators on behalf of Southington's schools, seniors, and veterans, and their opposition to criminal justice reforms and the New Britain ''[b]usway [b]oondoggle,'' the back of the mailer states that they have (1) ''consistently fought'' Governor Malloy's ''tax hike,'' ''agenda,'' and ''reckless spending,'' (2) ''tried to restore [c]ommon [s]ense and fiscal responsibility in state government,'' and (3) ''voted against [Governor Malloy's] budget which resulted in nearly $4 [b]illion in new and increased taxes for Connecticut residents.''

The second communication, exhibit 3 before the commission, is a trifold flyer that was jointly funded by and mentions both plaintiffs but focuses largely on Sampson's legislative accomplishments with respect to the towns of Southington and Wolcott and his endorsements by a variety of organizations. It states that both plaintiffs have fought for fiscally conservative positions and ''continue to work to eliminate needless regulations

and burdensome taxes and fees. Rather than accepting the job and business stifling proposals of Governor Malloy, [the plaintiffs] have pushed for less government and more freedom in an effort to get our economy moving again. . . . [The plaintiffs] are who we need in Hartford fighting for our community and to keep Governor Malloy and the [m]ajority Democrats in check.'' The flyer's reverse side emphasizes that Sampson specifically ''has fought Governor Malloy's 'Bad for Connecticut Agenda,' opposing [h]uge [i]ncreases in [g]overnment [s]pending, the [h]ighest [t]ax [i]ncrease in Connecticut [h]istory, the New Britain to Hartford [b]usway, the repeal of the [d]eath [p]enalty, and the [e]arly [r]elease of [v]iolent [c]riminals.''

The third communication, exhibit 4 before the commission, is an oversize postcard that features only Sampson and was paid for by Sampson's committee. It states that ''Sampson wants a [n]ew [d]irection and *rejects* Governor Malloy's policies,'' and that ''[i]t's time to change course and STOP Governor Malloy and the majority Democrats' dangerous agenda!'' (Emphasis in original.) Positing that ''[w]e need leaders like [Sampson] who know how to say *NO*,'' the mailer further states that Sampson ''has consistently fought Governor Malloy's reckless spending and voted against his budget which resulted in nearly $4 [b]illion in new and increased taxes for Connecticut residents!'' (Emphasis in original.)

The fourth communication, exhibit 5 before the commission, is an oversize, glossy foldout postcard, which features only Sampson and was paid for by Sampson's committee. In addition to highlighting Sampson's fiscal conservatism and organizational endorsements, it states that he ''has been a clear and consistent voice for common sense in Hartford, fighting Governor Malloy's destructive policies of wasteful spending and high taxes.'' It also highlights some of Mazurek's positions,

including votes taken when Mazurek previously served as a state representative, observing that a "vote for [Mazurek] is a vote to continue the reckless policies that are ruining our state" because (1) "[h]is last vote as our [s]tate [r]epresentative was to flip his own vote from no to yes and [to] give an additional $3 million dollars to [Governor] Malloy's campaign for [g]overnor," (2) "[h]e supported Governor Malloy's 'largest tax increase in history' state budget in 2012 saying '[t]he Democrats put forward a very good plan to mitigate the budget deficit,' " (3) "[h]e supports Governor Malloy's corporate welfare programs including $400 [million] in taxpayer funds taken from our community and small businesses to give to [United Technologies Corporation] saying 'Connecticut's economy is clearly the winner as a result of this legislation,' " and (4) "[i]n 2010, he voted to balance Connecticut's state budget by borrowing [$1] billion . . . piling more debt onto taxpayers and our children."

The fifth communication, exhibit 6 before the commission, is a local newspaper advertisement that was paid for by Sampson's committee. That advertisement featured a photograph of Sampson and emphasizes his "commonsense leadership" and his work to help "Wolcott receive its fair share of state aid to keep property taxes in check and our schools at their peak." In asking for Wolcott residents' vote, Sampson stated that he was "proud to have led the fight against the many bad policies put forth by [Governor] Malloy and the Democrats in Hartford."

Mazurek filed a complaint with the commission, alleging that these five communications[2] violated the statutes and regulations governing campaign finance and

_____

[2] The complaint also identified a sixth communication, namely, a mailer jointly funded by the committees of both plaintiffs. The commission dismissed the complaint with respect to the sixth communication, concluding that it did not violate the campaign finance statutes and regulations. That sixth communication is not at issue in this appeal.

Markley *v.* State Elections Enforcement Commission

the program under chapters 155 and 157 of the General Statutes, including General Statutes § 9-601b,[3] which defines the term "expenditure," General Statutes § 9-607 (g),[4] which governs which expenditures are "[p]ermissible," General Statutes (Rev. to 2013) 9-616 (a),[5]

---

[3] General Statutes § 9-601b provides in relevant part: "(a) As used in this chapter and chapter 157, the term 'expenditure' means:

"(1) Any purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value, when made to promote the success or defeat of any candidate seeking the nomination for election, or election, of any person or for the purpose of aiding or promoting the success or defeat of any referendum question or the success or defeat of any political party;

"(2) Any communication that (A) refers to one or more clearly identified candidates, and (B) is broadcast by radio, television, other than on a public access channel, or by satellite communication or via the Internet, or as a paid-for telephone communication, or appears in a newspaper, magazine or on a billboard, or is sent by mail; or

"(3) The transfer of funds by a committee to another committee.

"(b) The term 'expenditure' does not mean:

* * *

"(7) A communication described in subdivision (2) of subsection (a) of this section that includes speech or expression made (A) prior to the ninety-day period preceding the date of a primary or an election at which the clearly identified candidate or candidates are seeking nomination to public office or position, that is made for the purpose of influencing any legislative or administrative action, as defined in section 1-91, or executive action, or (B) during a legislative session for the purpose of influencing legislative action . . . ."

[4] General Statutes § 9-607 (g) provides in relevant part: "Permissible expenditures. (1) As used in this subsection, (A) 'the lawful purposes of the committee' means: (i) For a candidate committee or exploratory committee, the promoting of the nomination or election of the candidate who established the committee . . . .

"(2) Unless otherwise provided by this chapter, any treasurer, in accomplishing the lawful purposes of the committee, may pay the expenses of: (A) Advertising in electronic and print media; (B) any other form of printed advertising or communications including 'thank you' advertising after the election; (C) campaign items, including, but not limited to, brochures, leaflets, flyers, invitations, stationery, envelopes, reply cards, return envelopes, campaign business cards, direct mailings, postcards, palm cards, 'thank you' notes, sample ballots and other similar items . . . ."

[5] General Statutes (Rev. to 2013) § 9-616 (a) provides in relevant part: "A candidate committee shall not make contributions to, or for the benefit of, (1) a party committee, (2) a political committee, (3) a committee of a candidate for federal or out-of-state office, (4) a national committee, or *(5) another candidate committee except that (A) a pro rata sharing of certain expenses in accordance with subdivision (1) of subsection (b) of section 9-610 shall be permitted* . . . ." (Emphasis added.)

Markley *v.* State Elections Enforcement Commission

which bars candidate committees from making certain contributions, and §§ 9-706-1 and 9-706-2 of the Regulations of Connecticut State Agencies,[6] which implement the program, as they had been previously interpreted

Hereinafter, all references to § 9-616 are to the 2013 revision of the statute.

[6] Section 9-706-1 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) All funds in the depository account of the participating candidate's qualified candidate committee, including grants and other matching funds distributed from the Citizens' Election Fund, qualifying contributions and personal funds, *shall be used only for campaign-related expenditures made to directly further the participating candidate's nomination for election or election to the office specified in the participating candidate's affidavit* certifying the candidate's intent to abide by Citizens' Election Program requirements." (Emphasis added.)

Section 9-706-2 of the Regulations of Connecticut State Agencies provides in relevant part: "(a) In addition to the requirements set out in section 9-706-1 of the Regulations of Connecticut State Agencies, participating candidates and the treasurers of participating candidates shall comply with the following citizens' election program requirements. Permissible campaign-related expenditures shall include but are not limited to expenditures for the following:

"1. Purchase of political campaign advertising services from any communications medium, including but not limited to newspaper, television, radio, billboard or internet;

"2. Political campaign advertising expenses, including but not limited to printing, photography, or graphic arts related to flyers, brochures, palm cards, stationery, signs, stickers, shirts, hats, buttons, or other similar campaign communication materials;

"3. Postage and other commercial delivery services for political campaign advertising . . . .

* * *

"(b) In addition to the requirements set out in section 9-706-1 of the Regulations of Connecticut State Agencies, participating candidates and the treasurers of such participating candidates shall comply with the following citizens' election program requirements. Participating candidates and the treasurers of such participating candidates shall *not* spend funds in the participating candidate's depository account for the following:

* * *

"8. *Contributions, loans or expenditures to or for the benefit of another candidate, political committee or party committee* . . . .

"10. Any expenditure made in conjunction with another candidate for which the participating candidate does not pay his or her proportionate share of the cost of the joint expenditure . . . .

* * *

"13. Independent expenditures to benefit another candidate;

"14. Expenditures in violation of any federal, state or local law . . . ." (Emphasis added.)

Markley *v.* State Elections Enforcement Commission

by the commission in Advisory Opinion No. 2014-04 (Advisory Opinion).[7] In particular, the Advisory Opinion

---

[7] On October 17, 2014, the commission issued the Advisory Opinion "to respond to requests for clarification regarding the ability of candidates in the [program] to make expenditures for communications that refer to—and oppose or feature in a negative light—other candidates who are not their direct opponents." The commission relied on its previous Declaratory Ruling No. 2011-03, which "addressed when and how to allocate and report certain communications that reference or include more than one candidate," observing that the request under consideration had "a critical difference: here, the candidate proposed to be featured in the communication is not being promoted by the communication (but, rather, is being opposed) and is not a direct opponent of the candidate making the communication. An example would be a state senate candidate producing an ad that promoted such candidate but also disparaged a candidate for [the] governor's policies and performance, or an ad that claimed that if the challenging gubernatorial candidate won the election, the state would not perform well economically."

Following a comprehensive discussion of the applicable statutes and regulations, the Advisory Opinion emphasized the voluntary nature of a candidate's agreement to follow the program's restrictions; see Regs. Conn. State Agencies § 9-706-1 (a); in positing that it is "particularly important for participating candidates to avoid spending campaign funds to promote another candidate and to refrain from accepting in-kind contributions in the form of advertising from other candidates that might cause an expenditure limit violation." The commission further observed that, under a 2013 amendment to the definition to "expenditure" in General Statutes § 9-601 (25) to include negative as well as positive communications, although "the candidate committee of a [program] participant may not attack candidates opposing other members of such candidate's party, the state central committees, the town committees, and any candidates in the race directly opposing the candidate being attacked may all bear the portion of the cost allocated to the negative advertising. . . . Legislative leadership and legislative caucus committees may also bear the cost of negative advertising against opponents in General Assembly races." (Citations omitted.)

The commission ultimately concluded that, "[u]nless such an exception [to the definition of expenditure] applies, *when a [program] candidate makes a communication that is not directly related to the candidate's own race and that also promotes the defeat of or attacks a candidate [who] is not a direct opponent of the candidate sponsoring the communication, but is in a different race, then the cost of that communication must be properly allocated.*" (Emphasis added.) As an example of the application of this rule, including the permissible allocation of costs for otherwise precluded expenses pursuant to its Declaratory Ruling No. 2011-03, the commission posited that, "if participating state senate candidate Jones ran an ad disparaging participating gubernatorial candidate Smith, it would generally not be considered a permissible expenditure by Jones' candidate committee. If candidate Jones wishes to produce such an ad, it would be permissible if it were paid for jointly with a committee that could legally support candidate

Markley *v.* State Elections Enforcement Commission

considered § 9-706-1 (a) of the regulations, which limits the use of ''[a]ll funds in the [candidate committee's] depository account'' to ''campaign-related expenditures made to *directly further* the participating candidate's nomination for election or election to the office specified in the participating candidate's affidavit certifying the candidate's intent to abide by [the program's] requirements,'' and § 9-706-2 (b) (8) of the regulations, which provides that those funds may not be used for ''[c]ontributions, loans or expenditures to or for the benefit of another candidate, political committee or party committee . . . .'' (Emphasis added.) The Advisory Opinion concluded that, in the absence of a statutory exception to the definition of ''expenditure,'' those candidate funds could not be used to make ''a communication that is not directly related to the candidate's own race *and that also promotes the defeat of or attacks a candidate [who] is not a direct opponent of the candidate sponsoring the communication*, but is in a different race . . . .'' (Emphasis added.)

Following a contested case hearing, the commission issued a decision, in which it considered the governing statutes and regulations as interpreted by its Advisory Opinion and concluded that the five communications were impermissible expenditures for a program candidate because they ''clearly identify a candidate from another race (Governor Malloy) within ninety days of an election. . . . When mentioned, Governor (and candidate) Malloy was consistently identified with 'bad' and 'destructive policies,' 'reckless' and 'wasteful spending,' [and] as [being] responsible for removing '[c]ommon [s]ense and fiscal responsibility' from state government, as well as for the 'largest tax increase in history,' among other dubious accomplishments. . . . In other words,

Smith's opponent or oppose candidate Smith. In this example, that could be the candidate committee of Smith's opponent, or alternatively could be a state central committee, or any town committee—all of which may make organization expenditures opposing candidate Smith.''

Markley *v.* State Elections Enforcement Commission

[the communications] opposed Governor Malloy, who was a candidate. Whether measured by either definition of 'expenditure,' such communications were covered.'' (Citations omitted.) The commission further observed that the plaintiffs had not made any efforts to allocate a pro rata share of the otherwise impermissible expenditures to an appropriate party committee or candidate opposed to Governor Malloy. Accordingly, the commission ordered each of the plaintiffs to pay civil penalties within ninety days of its decision.[8] The commission subsequently denied the plaintiffs' motion for reconsideration.

The plaintiffs brought an administrative appeal from the final decision of the commission to the trial court pursuant to General Statutes § 4-183, claiming that ''the expenditure limitations imposed as conditions of their receipt of public campaign funding'' violated their first amendment rights ''by restricting [their] ability to speak about other, nonopposing candidates.''[9] (Internal quota-

_____

[8] Emphasizing that candidates take an oath to follow the statutory and regulatory requirements of the program as a condition of accepting public funding, the commission also observed that candidates are personally responsible under General Statutes § 9-703 (a) (2) to reimburse the program for impermissible expenditures by their committees. After considering certain mitigating circumstances, namely, the plaintiffs' accurate disclosures of their expenses and lack of history of noncompliance, the commission ordered Markley to pay a civil penalty in the amount of $1000 for each of two violations, for an aggregate civil penalty in the amount of $2000, and Sampson to pay a civil penalty in the amount of $1000 for each of five violations, for an aggregate civil penalty in the amount of $5000.

The commission also ordered Markley's treasurer, Barbara P. Roberts, who was a respondent, to ''henceforth strictly comply'' with the applicable statutes and regulations. Scott M. Cleary, who was Sampson's treasurer and another respondent in this matter, resolved his matter separately with the commission.

[9] The trial court initially rendered judgment dismissing the plaintiffs' administrative appeal as untimely under § 4-183 (b). The plaintiffs appealed from that judgment of dismissal, which we subsequently reversed in 2021, directing the trial court to consider the merits of the appeal on remand. See *Markley* v. *State Elections Enforcement Commission*, 339 Conn. 96, 101, 112, 259 A.3d 1064 (2021).

Markley *v.* State Elections Enforcement Commission

tion marks omitted.) Applying the standard articulated in Chief Justice John Roberts' opinion in *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469–70, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007) (opinion announcing judgment) (*Wisconsin Right to Life*), the trial court first engaged in the " 'independent examination' " sought by the plaintiffs and concluded that, as a factual matter, the communications "were *both* an exhortation to vote for [the plaintiffs] *and* the 'functional equivalent of express advocacy' for the defeat of Governor Malloy." (Emphasis in original.) Thus, the trial court concluded that the commission had correctly determined that, as a factual matter, the plaintiffs had violated General Statutes (Rev. to 2013) § 9-616 (a) (5) and §§ 9-706-1 (a) and 9-706-2 (b) (8) of the Regulations of Connecticut State Agencies. See footnotes 5 and 6 of this opinion.

The trial court then considered whether this application of the statutes and regulations violated the plaintiffs' first amendment rights. Relying heavily on the United States Supreme Court's landmark decision in *Buckley* v. *Valeo*, 424 U.S. 1, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976), *Republican National Committee* v. *Federal Election Commission*, 487 F. Supp. 280 (S.D.N.Y.), aff'd, 445 U.S. 955, 100 S. Ct. 1639, 64 L. Ed. 2d 231 (1980), and *Corren* v. *Condos*, 898 F.3d 209 (2d Cir. 2018), the trial court concluded that the program constitutes a valid alternative route by which the plaintiffs had elected to exercise their first amendment rights and that the program's conditions did not abridge those rights. The trial court emphasized that "the plaintiffs [could] still express support for or against other candidates through their own unlimited expenditures and any properly coordinated expenditures. So, in limiting their prohibition of such expenditures to the funds in the candidate committee's depository [account], the statute and regulations in question have narrowly tai-

Markley *v.* State Elections Enforcement Commission

lored the prohibition to serve the legitimate state interest in ensuring that public funds are spent only to serve the purpose for which they were granted in the first place, namely, to support the campaign of the candidate who requested them.''[10] Accordingly, the trial court rendered judgment affirming the decision of the commission. This appeal followed.

On appeal, the plaintiffs rely on *Buckley* v. *Valeo*, supra, 424 U.S. 1, along with the United States Supreme Court's more recent decisions in *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), and *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 449, and contend that ''[l]imits or prohibitions on expenditures are burdens on political speech that are subject to strict scrutiny.'' Emphasizing the ''highly effective'' rhetorical value in ''summarily describ[ing]'' a candidate's views by reference to ''a better known candidate appearing elsewhere on the ballot,'' they claim that the commission's enforcement of the statutes and regulations to the effect that ''the mere mention of a nonopposing candidate's name in campaign materials'' constitutes an actionable violation, affects ''core political speech'' without justification by a compelling governmental interest, and, therefore, violates the first amendment. The plaintiffs further contend that, even if viewed as a properly imposed condition on the acceptance of public funds for participation in the program, the commission's decision in this case violates the first amendment because, under *Wisconsin Right to Life*, the mere mention of another candidate's name in a

---

[10] The trial court rejected the plaintiffs' characterization of ''the prohibitions on the use of candidate committee funds to promote the cause of a candidate other than the one who established the committee as 'content-based' restrictions, i.e., 'those that target speech based on its communicative content,' '' which, under *Reed* v. *Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015), are presumptively unconstitutional unless '' 'narrowly tailored to serve compelling state interests.' ''

Markley *v.* State Elections Enforcement Commission

campaign communication is not the "functional equivalent" of "advocacy for or against" that candidate's election in a different race. They contend, therefore, that the trial court improperly relied on leading unconstitutional conditions cases, namely, *Rust* v. *Sullivan*, 500 U.S. 173, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991), and *Regan* v. *Taxation with Representation of Washington*, 461 U.S. 540, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983), to uphold the conditions imposed by the commission in its Advisory Opinion and enforced in this case.

In response, the commission cites *Buckley*'s footnote 65; see *Buckley* v. *Valeo*, supra, 424 U.S. 57 n.65; and several decisions from the federal courts of appeals, including *Corren* v. *Condos*, supra, 898 F.3d 209, and relies on the voluntary nature of the program in arguing that "[c]onditions on expenditures contained in public financing programs do not even implicate the first amendment, and, even if they do, they do not violate it. The relinquishment of core first amendment rights to unlimited speech and unlimited fundraising are at the heart of every public financing program." Positing that the plaintiffs seek to establish a "loophole" that would undermine the program by "[a]llowing unlimited attack ads in other races funded with [program] funds," the commission contends that reducing public corruption and protecting the public fisc by preventing the circumvention of program requirements are compelling state interests supporting the restriction. It also emphasizes that its application of the " 'direct furtherance' " condition to program grants does not entirely foreclose participating candidates from using messaging like that at issue in this case because they remain free to "allocate and share [those] costs with other spenders," including their own personal funds, state and town committees, and appropriate candidates, such as Governor Malloy's opponents in the 2014 election. We agree with the plaintiffs, however, and conclude that the commission's

enforcement of the program statutes and regulations in accordance with its Advisory Opinion imposed an unconstitutional condition in violation of the first amendment to the extent that it penalized the mention of Governor Malloy's name in a manner that was not the functional equivalent of speech squarely directed at his reelection campaign.

"Fundamental first amendment principles guide our analysis of the [plaintiffs'] claims in this appeal. The [f]irst [a]mendment, applicable to the [s]tates through the [due process clause of the] [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas— even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies [the government] the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The [f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech. . . . The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 336 Conn. 332, 351–52, 246 A.3d 429 (2020), cert. denied,        U.S.        , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

Whether the commission violated the first amendment by enforcing the program regulations to preclude the plaintiffs from mentioning Governor Malloy by name in their campaign communications is a question of law subject to plenary review via an "independent examination" of the record. (Internal quotation marks omitted.) Id., 352; see *Meriden* v. *Freedom of Informa-*

*tion Commission*, 338 Conn. 310, 318–19, 258 A.3d 1 (2021) (plenary appellate review under Uniform Administrative Procedure Act, General Statutes § 4-166 et seq.).

I

FIRST AMENDMENT PRINCIPLES GOVERNING
RESTRICTIONS ON PUBLIC
CAMPAIGN FUNDS

The claims in this appeal present issues at the intersection of two different areas of first amendment law. First, they require us to consider the various United States Supreme Court decisions addressing the constitutionality of various campaign finance reform laws under the first amendment, beginning with its landmark decision in *Buckley* v. *Valeo*, supra, 424 U.S. 1. Next, because public campaign financing by definition involves governmental grants to private individuals seeking to engage in what is axiomatically a protected activity under the first amendment, we must consider whether restrictions imposed in connection with those grants pass muster under the unconstitutional conditions doctrine, which holds that "the [g]overnment may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit. . . . In some cases, a funding condition can result in an unconstitutional burden on [f]irst [a]mendment rights." (Citation omitted; internal quotation marks omitted.) *Agency for International Development* v. *Alliance for Open Society International, Inc.*, 570 U.S. 205, 214, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013) (*Alliance for Open Society International*).

The threads of case law that emanate from these doctrines ultimately distill to a few general principles that dictate our conclusion in this appeal. First, although laws that burden political speech, including expendi-

Markley *v.* State Elections Enforcement Commission

ture limitations, ordinarily are subject to strict scrutiny; see, e.g., *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 734, 131 S. Ct. 2806, 180 L. Ed. 2d 664 (2011); candidates who voluntarily accept public campaign financing also accept reasonable terms and conditions attendant to such programs that otherwise may abridge their free speech rights. See, e.g., *Corren* v. *Condos*, supra, 898 F.3d 221–22; *Republican National Committee* v. *Federal Election Commission*, supra, 487 F. Supp. 284–85. Nevertheless, to the extent that such terms and conditions do not serve the compelling state interest of protecting the governmental fisc and the integrity of the public financing program, they are an unconstitutional condition on inherently private speech that does not survive strict scrutiny. See, e.g., *Legal Services Corp.* v. *Velazquez*, 531 U.S. 533, 543–44, 121 S. Ct. 1043, 149 L. Ed. 2d 63 (2001). In this case, prohibiting publicly funded candidates from engaging in campaign speech concerning outside races survives strict scrutiny if it is narrowly tailored to protect the public fisc by enforcing the limitations of the program. A preclusion on campaign speech that refers to a candidate in another race is narrowly tailored to achieve that compelling state interest only when the speech at issue is unquestionably the functional equivalent of campaign speech in the outside race, rather than a rhetorical device intended to communicate where the speaker stands on the issues. See, e.g., *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 469–70 (opinion announcing judgment). In part II of this opinion, we conclude that none of the communications at issue in this appeal could reasonably be construed as anything more than a rhetorical device intended to communicate the merits of the plaintiffs' candidacies as bulwarks against the policies endorsed by Governor Malloy and the Democratic Party.

Markley *v.* State Elections Enforcement Commission

## A

### *Buckley* and Its Progeny

We begin with a discussion of the first amendment principles governing campaign finance reform laws since the United States Supreme Court decided *Buckley* v. *Valeo*, supra, 424 U.S. 1, nearly fifty years ago. It is well established that "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of our system of government. . . . As a result, the [f]irst [a]mendment has its fullest and most urgent application to speech uttered during a campaign for political office. . . . Laws that burden political speech are accordingly subject to strict scrutiny, which requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." (Citations omitted; internal quotation marks omitted.) *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, supra, 564 U.S. 734; see *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 340; *Buckley* v. *Valeo*, supra, 14–15; see also *Seymour* v. *Elections Enforcement Commission*, 255 Conn. 78, 83–85, 762 A.2d 880 (2000) (setting forth background principles governing first amendment protections for political speech), cert. denied, 533 U.S. 951, 121 S. Ct. 2594, 150 L. Ed. 2d 752 (2001).

The United States Supreme Court has applied these principles to invalidate government imposed "restrictions on campaign expenditures, [*Buckley* v. *Valeo*, supra, 424 U.S. 52–54], restraints on independent expenditures applied to express advocacy groups, [*Federal Election Commission* v. *Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256–65, 107 S. Ct. 616, 93 L. Ed. 2d 539 (1986) (opinion announcing judgment)], limits on uncoordinated political party expenditures, [*Colorado Republican Federal Campaign Committee* v. *Federal Election Commission*, 518 U.S. 604, 608, 116 S. Ct. 2309,

135 L. Ed. 2d 795 (1996) (opinion announcing judgment)], and regulations barring unions, nonprofit and other associations, and corporations from making independent expenditures for electioneering communication, [*Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 372].'' *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, supra, 564 U.S. 734–35; see id., 753 (invalidating matching funds provision under state public financing scheme on ground that its award of additional funds to publicly funded candidates had effect of penalizing political speech by candidates and independent expenditures, which was undue burden not justified by state interests in preventing corruption or encouraging participation in public financing program); *Davis* v. *Federal Election Commission*, 554 U.S. 724, 729–30, 739–40, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008) (invalidating ''the so-called 'Millionaire's Amendment' '' to Bipartisan Campaign Reform Act of 2002 (BCRA), 2 U.S.C. § 441a-1 (a), which tripled contribution limits of congressional candidates whose opponents spent more than $350,000 in personal funds, because it was ''an unprecedented penalty'' that was not supported by compelling state interest and that required candidates ''to choose between the [f]irst [a]mendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations'').

''At the same time,'' the United States Supreme Court has ''subjected strictures on [campaign related] speech that [it has] found less onerous to a lower level of scrutiny and upheld those restrictions. For example, after finding that the restriction at issue was closely drawn to serve a sufficiently important interest, see, e.g., [*McConnell* v. *Federal Election Commission*, 540 U.S. 93, 136, 124 S. Ct. 619, 157 L. Ed. 2d 491 (2003), overruled in part on other grounds by *Citizens United* v. *Federal Election Commission*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010)], [*Nixon* v. *Shrink*

Markley *v.* State Elections Enforcement Commission

*Missouri Government PAC*, 528 U.S. 377, 387–88, 120 S. Ct. 897, 145 L. Ed. 2d 886 (2000)], [the court has] upheld [government imposed] limits on contributions to candidates, [*Buckley* v. *Valeo*, supra, 424 U.S. 23–35], caps on coordinated party expenditures, [*Federal Election Commission* v. *Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 437, 121 S. Ct. 2351, 150 L. Ed. 2d 461 (2001)], and requirements that political funding sources disclose their identities, [*Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 371].'' (Internal quotation marks omitted.) *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, supra, 564 U.S. 735.

The case law is less clear with respect to the nature of the first amendment scrutiny applicable to limitations imposed on candidates in connection with public financing. The starting point again is the United States Supreme Court's landmark decision in *Buckley*, in which the court rejected a first amendment challenge to the federal public financing of political campaigns; the court considered public funding "a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. Thus, [public financing] furthers, not abridges, pertinent [f]irst [a]mendment values." (Footnote omitted.) *Buckley* v. *Valeo*, supra, 424 U.S. 92–93. Addressing expenditure limitations imposed on publicly funded candidates, the court stated in dictum in footnote 65 of the opinion that "Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations. Just as a candidate may voluntarily limit the size of the contributions he chooses to accept, he may decide to forgo private fundraising and accept public funding." Id., 57 n.65.

Markley *v.* State Elections Enforcement Commission

The leading case applying the dictum in *Buckley*'s footnote 65 in considering the constitutionality of candidate spending limitations under the federal public financing scheme is the panel decision of the United States District Court for the Southern District of New York, later affirmed without opinion by the United States Supreme Court, in *Republican National Committee* v. *Federal Election Commission*, supra, 487 F. Supp. 280. In *Republican National Committee*, the court upheld the aggregate limitations on federal and presidential candidate expenditures under the federal public funding schemes of the Presidential Election Campaign Fund Act, 26 U.S.C. § 9001 et seq., and the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. § 431 et seq. See *Republican National Committee* v. *Federal Election Commission*, supra, 282. The court observed "that a presidential candidate is not compelled to accept public financing under the statutes or to accept the limitations imposed," leaving the court with "the issue of whether Congress may lawfully condition a presidential candidate's eligibility for public federal campaign funds [on] the candidate's voluntary acceptance of limitations on campaign expenditures and private contributions." Id., 284. The court recognized that, under cases such as *Perry* v. *Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972), "Congress may not condition [a] benefit on the sacrifice of protected rights . . . ." (Citations omitted.) *Republican National Committee* v. *Federal Election Commission*, supra, 284. Nevertheless, the court concluded that the aggregate expenditure limitations at issue did not violate this principle because, "as long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate the [f]irst [a]mendment rights of the candidate or supporters." Id.; see id., 285 (because "the candidate remains free to choose between funding

Markley *v.* State Elections Enforcement Commission

alternatives, he or she will opt for public funding only if, in the candidate's view, it will *enhance* the candidate's powers of communication and association'' (emphasis in original)). The court further determined that, even if ''the conditions imposed by Congress'' were viewed as a burden on the first amendment rights of publicly financed candidates, that burden ''is fully justified by . . . compelling state interests,'' namely, the ''goals of Congress . . . to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising . . . .'' (Citations omitted; internal quotation marks omitted.) Id., 285; see id., 285–86 (emphasizing need for ''reasonable limits and conditions'' in preventing ''[the defeat of] the purpose of public financing'' and noting that ''the conditions placed on the expenditure of public funds are necessary to the effectiveness of a program [that] furthers significant state interests'').

Subsequent federal decisions considering first amendment challenges to various expenditure limitations imposed in connection with federal public financing programs are consistent with *Republican National Committee*'s treatment of the voluntary nature of such programs as dispositive. For example, in *John Glenn Presidential Committee, Inc.* v. *Federal Election Commission*, 822 F.2d 1097, 1098 (D.C. Cir. 1987), a presidential campaign committee challenged the Federal Election Commission's application of a statutory recoupment remedy to recover money spent in violation of state-by-state restrictions. The District of Columbia Circuit Court of Appeals cited *Regan* v. *Taxation with Representation of Washington*, supra, 461 U.S. 545, for the proposition that '' 'the government may not deny a benefit to a person because he exercises a constitutional right' '' but concluded that the ''statutory recoupment remedy pursued by the [Federal Election

Commission] does not call back private spending; it . . . police[s] the restrictions Congress placed on the expenditure of public [money]. Campaign speech within a state is surely activity sheltered by the [c]onstitution. A ceiling on public subsidies for that activity, however, cannot be equated . . . with a proscription of or a penalty on the activity.'' *John Glenn Presidential Committee, Inc.* v. *Federal Election Commission*, supra, 1098; see *Bush-Quayle '92 Primary Committee, Inc.* v. *Federal Election Commission*, 104 F.3d 448, 452 (D.C. Cir. 1997) (rejecting argument that ''too restrictive an interpretation of the [presidential public funding] statute would prevent a candidate from engaging in certain political speech'' because it ''would mean only that the candidate could not depend on public funds to subsidize that speech''); *John Glenn Presidential Committee, Inc.* v. *Federal Election Commission*, supra, 1099–1100 (rejecting attack on program's ''state-by-state limitations'' because that restriction ''applies only to federal funds, not to private [money], spent for unqualified purposes,'' and ''a legislature's decision not to subsidize the exercise of a fundamental right—a fortiori, a decision to place dollar limits on public subsidies—does not infringe that right''); cf. *Federal Election Commission* v. *Massachusetts Citizens for Life, Inc.*, supra, 479 U.S. 256 n.9 (opinion announcing judgment) (rejecting argument that *Regan* supports ''[the] contention that the requirement that independent spending be conducted through a separate segregated fund does not burden [the organization's] [f]irst [a]mendment rights'' because independent spending is ''core political speech under the [f]irst [a]mendment,'' and no government subsidy was at issue).

With respect to state public campaign finance schemes, the relatively recent decision of the United States Court of Appeals for the Second Circuit in *Corren* v. *Condos*, supra, 898 F.3d 209, considered the constitutionality of

Markley *v.* State Elections Enforcement Commission

various conditions and limitations imposed in connection with Vermont's public financing program. See id., 212–13. In *Corren,* the court followed *Republican National Committee* and *Buckley* and held that Vermont's individual contribution limit did not violate the first amendment rights of publicly financed candidates by burdening their "ability to speak and associate, particularly with political parties . . . ." Id., 220. Emphasizing the Vermont candidates' opportunity to choose whether public or private campaign funding would be most advantageous in supporting the exercise of their first amendment rights, the Second Circuit concluded that the unconstitutional conditions doctrine[11] did *not* entail "a heightened level of scrutiny because the terms of the [o]ption condition a benefit—[in Vermont], a grant of public financing—on a [publicly financed candidate's] ostensible sacrifice of a constitutional right— namely the ability to raise unlimited private contributions."[12] Id., 220–21. Thus, the Second Circuit concluded that "the voluntary decision to accept public funds and [to] forgo the ability to accept private contributions does not burden [publicly financed candidates'] [f]irst [a]mendment rights," rendering it unnecessary to determine whether an important state interest justified any burden. Id., 222; see *North Carolina Right to Life Committee Fund for Independent Political Expenditures* v. *Leake,* 524 F.3d 427, 436–37 (4th Cir.), cert. denied sub nom. *Duke* v. *Leake,* 555 U.S. 994, 129 S. Ct. 490, 172 L. Ed. 2d 357 (2008); *Daggett* v. *Commission on*

---

[11] See part I B of this opinion.

[12] The Second Circuit reads *Republican National Committee* v. *Federal Election Commission,* supra, 487 F. Supp. 284–85, to "clearly [set] out a disjunctive test, under which a statute is constitutionally sound if it *either* does not diminish rights *or* is justified by a sufficient interest. . . . [A] candidate's ability to choose either to receive public funds or [to] raise unlimited private funds does not diminish her ability to speak. Therefore, under [*Republican National Committee*], that condition need not be justified by a sufficient interest for the law to be constitutionally sound." (Emphasis in original.) *Corren* v. *Condos,* supra, 898 F.3d 221.

*Government Ethics & Election Practices*, 205 F.3d 445, 467 (1st Cir. 2000); *Gable* v. *Patton*, 142 F.3d 940, 948 (6th Cir. 1998), cert. denied, 525 U.S. 1177, 119 S. Ct. 1112, 143 L. Ed. 2d 108 (1999), and cert. denied, 525 U.S. 1177, 119 S. Ct. 1112, 143 L. Ed. 2d 108 (1999); *Rosenstiel* v. *Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996), cert. denied, 520 U.S. 1229, 117 S. Ct. 1820, 137 L. Ed. 2d 1028 (1997).

Expanding on this analysis, the Second Circuit declined to apply heightened scrutiny to various challenges to certain other restrictions imposed by Vermont's public financing scheme, reasoning that they do not implicate publicly funded candidates' fundamental rights given the voluntary nature of the program. See *Corren* v. *Condos*, supra, 898 F.3d 227–30. Specifically, the court upheld contribution limits applicable to political parties to avoid the circumvention of the limits imposed on individuals as "necessary to maintain a public financing system," observing that any adverse effect on the constitutional rights of political parties "is closely drawn to the important governmental interests served by a public financing system." Id., 226. Similarly, the court rejected a challenge to the preclusion of publicly financed candidates' use of personal funds for campaign expenditures. See id., 227–28. Finally, the Second Circuit upheld timing restrictions that disqualify candidates from public financing if they announce their bid for office or accept significant contributions before the end of a qualification period. See id., 228–30.

We agree with the plaintiffs, however, that the pure voluntariness analysis embodied by *Buckley*, *Republican National Committee*, and *Corren* is not dispositive of this appeal. Indeed, in *Corren*, the Second Circuit appeared to acknowledge the limitations of its analysis. In a footnote, the court limited its holding to expenditure limitations and described as "troubling" certain hypothetical restrictions on the speech and conduct of

Markley *v.* State Elections Enforcement Commission

publicly funded candidates, including one precluding them from campaigning against certain other candidates.[13] *Corren* v. *Condos*, supra, 898 F.3d 222 n.6. Because the program restriction at issue in this appeal is not a generalized expenditure limit but, rather, directly governs the content of publicly financed candidates' messaging in the course of engaging in the first amendment conduct facilitated by the program, a more searching analysis is required. This analysis is complicated by the fact that neither the parties' briefs nor our independent research has revealed any case law considering whether expenditure restrictions that govern the specific content of a publicly financed candidate's campaign messaging pass muster under the first amendment.

B

Unconstitutional Conditions Doctrine and
Public Financing Restrictions

As a starting point, we observe that the overriding focus on voluntariness as a dispositive factor in this line of cases is analytically inconsistent with the United States Supreme Court's post-*Buckley* case law consider-

_____

[13] Specifically, in *Corren*, the Second Circuit considered a reductio ad absurdum argument that the voluntariness aspect of its holding would operate to save a condition that publicly financed candidates "*refrain from discussing certain issues or associating with certain groups*, possess certain religious affiliations, or *not campaign against certain candidates*." (Emphasis added.) *Corren* v. *Condos*, supra, 898 F.3d 222 n.6. Although the Second Circuit declined to "address whether any of those specific conditions would be permissible because they [were] not before [the court] in [that] case," the court stated that, "were an offer of [public] funding so advantageous that a candidate did feel compelled to accept the funding despite objecting to a condition attached thereto, [the court] would review whether the condition burdened the candidate's rights and, if it did, review whether imposing that condition nonetheless satisfied the appropriate level of scrutiny." Id. Significantly, the court found it "hard to imagine that any of [those] conditions . . . would further a legitimate governmental interest such that it could pass the applicable level of scrutiny" and emphasized that the candidates in *Corren* had "not shown that [its] analysis would permit any of the troublesome conditions that they identif[ied] to hinder candidates' exercise of their rights." Id.

ing whether conditions imposed in connection with the acceptance of government funding in a variety of other contexts violate the first amendment. As one prominent scholarly commentator, Professor Richard Briffault of Columbia Law School, has observed, *Buckley*'s footnote 65 "provides support for an argument that the voluntariness of the public funding program would be sufficient to justify a speech constraint on publicly funded candidates. However, the unconstitutional conditions doctrine suggests that some conditions that burden the liberties of grant recipients are unconstitutional even though the grantee is free to turn down the grant and the conditions." R. Briffault, "Public Funds and the Regulation of Judicial Campaigns," 35 Ind. L. Rev. 819, 843 (2002). Indeed, Joel M. Gora, a scholar who was counsel for the plaintiff in *Buckley*, has criticized footnote 65 as fundamentally flawed for failing to discuss "why a 'voluntary' agreement to surrender [f]irst [a]mendment rights was permissible" because, "had there been such a discussion, it would have had to engage the [United States Supreme] Court's 'unconstitutional conditions' doctrine." J. Gora, "Don't Feed the Alligators: Government Funding of Political Speech and the Unyielding Vigilance of the First Amendment," 2010–2011 Cato Sup. Ct. Rev. 81, 126 (2011); see R. Briffault, supra, 827 ("*Buckley*'s only statement concerning the spending limit indicates that voluntariness is critical, but that statement occurs in a footnote, involved minimal analysis, and is arguably dictum"); J. Gora, supra, 126 ("[T]he broader issue is whether you can ever 'voluntarily' be made to surrender a constitutional right to obtain a government benefit. Put in the *Buckley* context, if you have a [f]irst [a]mendment right to spend as much as you can raise on your campaign, how can the government make you surrender that right in order to get government funding for your campaign? In this context, can the government purchase what it cannot com-

Markley *v.* State Elections Enforcement Commission

mand?''); see also J. Gora, supra, 121–24 (questioning whether rationale for upholding public finance scheme in *Buckley* is consistent with subsequent decision in *Arizona Free Enterprise Club's Freedom Club PAC*, which struck down award matching funds to publicly funded candidates as ''triggered'' by expenditures of privately financed opponents).

1

Background Principles

We turn, then, to a review of the unconstitutional conditions doctrine, which has been described as embodying ''a characteristic technique by which [the] government appears not to, but in fact does burden . . . liberties''; K. Sullivan, ''Unconstitutional Conditions,'' 102 Harv. L. Rev. 1413, 1419 (1989); and as providing ''a shorthand response to the view[s] that those who voluntarily participate in government programs have 'waived' their constitutional objections . . . and . . . that the government's power not to create a regulatory program necessarily includes the power to impose on that program whatever conditions it chooses.'' C. Sunstein, ''Why the Unconstitutional Conditions Doctrine Is an Anachronism (with Particular Reference to Religion, Speech, and Abortion),'' 70 B.U. L. Rev. 593, 593–94 (1990); see L. Mayer, ''Nonprofits, Speech, and Unconstitutional Conditions,'' 46 Conn. L. Rev. 1045, 1049 (2014) (''[g]iven the pervasiveness of government benefits and therefore the risk to constitutionally guaranteed freedoms if there is not a robust unconstitutional conditions doctrine, it is critical that a way be found to salvage the doctrine whenever possible''); see also *State* v. *Angel M.*, 337 Conn. 655, 683–84, 255 A.3d 801 (2020) (*Ecker, J.*, concurring) (discussing potential application of unconstitutional conditions doctrine at sentencing in connection with defendant's failure to

Markley *v.* State Elections Enforcement Commission

apologize to victims, as juxtaposed to his right to maintain his innocence).

We begin the "notoriously tricky"[14] unconstitutional conditions analysis with *Alliance for Open Society International*, which is the United States Supreme Court's most recent, leading decision considering whether conditions imposed in connection with a government subsidy program violate the first amendment rights of the recipient. In *Alliance for Open Society International*, the court observed—consistent with the reasoning of public financing decisions such as *Corren* v. *Condos*, supra, 898 F.3d 209, and *Republican National Committee* v. *Federal Election Commission*, supra, 487 F. Supp. 280—that, as "a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its [f]irst [a]mendment rights." *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 570 U.S. 214. Nevertheless, "the [g]overnment may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit. . . . In some cases, a fund-

---

[14] Both the United States Supreme Court and numerous commentators have recognized that unconstitutional conditions cases arising in the funding context present "a notoriously tricky question of constitutional law." *Matal* v. *Tam*, 582 U.S. 218, 239, 137 S. Ct. 1744, 198 L. Ed. 2d 366 (2017) (opinion announcing judgment); see, e.g., R. Briffault, supra, 35 Ind. L. Rev. 821 ("[the unconstitutional conditions] doctrine is a murky one . . . and provides no clear answer to the question of whether a campaign speech code [for publicly funded judicial candidates] could be an unconstitutional condition"); R. Kozel, "Leverage," 62 B.C. L. Rev. 109, 124 (2021) ("[t]he doctrine of unconstitutional conditions, charged with safeguarding liberty in the face of government's ubiquitous programming and extraordinary resources, is famously murky"); L. Mayer, supra, 46 Conn. L. Rev. 1047 ("[i]f there is any consensus with respect to the doctrine of unconstitutional conditions, it is that the doctrine is a mess both generally and in the specific constitutional contexts in which the courts have applied it").

349 Conn. 67 MAY, 2024 99

Markley *v.* State Elections Enforcement Commission

ing condition can result in an unconstitutional burden on [f]irst [a]mendment rights.'' (Citation omitted; internal quotation marks omitted.) Id. In the spending context, ''the relevant distinction . . . is between *conditions that define the limits of the government spending program*—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the program itself. The line is hardly clear, in part because the definition of a particular program can always be manipulated to subsume the challenged condition. [The United States Supreme Court has] held, however, that 'Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the [f]irst [a]mendment be reduced to a simple semantic exercise.' '' (Emphasis added.) Id., 214–15, quoting *Legal Services Corp.* v. *Velazquez*, supra, 531 U.S. 547; see J. Blocher, ''New Problems for Subsidized Speech,'' 56 Wm. & Mary L. Rev. 1083, 1114 (2015) (By ''upholding an unconstitutional [conditions style] claim in a case like [*Alliance for Open Society International*], the [United States Supreme] Court suggests that the recipient of what might seem to be government largesse actually has some kind of constitutional entitlement to those funds. Were it otherwise, the case could be decided on the basis of [Chief Justice Roberts'] observation that '[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds.' '').

The United States Supreme Court observed that this distinction between conditions that define the scope of a program and conditions that regulate speech outside the contours of that program was ''illustrate[d]'' by its decisions in *Rust* v. *Sullivan*, supra, 500 U.S. 173, *Regan* v. *Taxation with Representation of Washington*, supra, 461 U.S. 540, and *Federal Communications Commission* v. *League of Women Voters of California*, 468 U.S.

364, 104 S. Ct. 3106, 82 L. Ed. 2d 278 (1984) (League of Women Voters). *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 570 U.S. 215; see id., 215–18. In *League of Women Voters*, the United States Supreme Court struck down a grant's complete prohibition on television and radio stations "editorializing," including with the use of separate private funds, because it went beyond precluding the use of federal funds to subsidize editorializing and, instead, affected stations' speech on matters of public importance beyond the scope of the federal program. *Federal Communications Commission* v. *League of Women Voters of California*, supra, 399–401; see *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 215–16. In contrast, in *Rust*, the court upheld a condition of grants under Title X of the Public Health Service Act barring recipients from advocating for abortion as a family planning method because grantees could still engage in abortion advocacy using physically and financially separate programs that did not receive Title X funds, meaning that Congress could define the federal program to encourage only particular family planning methods. *Rust* v. *Sullivan*, supra, 193–98; see *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 216–17. Similarly, in *Regan* v. *Taxation with Representation of Washington*, supra, 544–45 and n.6, the court held that Congress could limit tax-exempt status under 26 U.S.C. § 501 (c) (3) "to organizations that did not attempt to influence legislation" because "tax-exempt status . . . 'ha[d] much the same effect as a cash grant to the organization,' " and the prohibition did not forbid organizations from lobbying altogether because they could incorporate separately for that purpose under 26 U.S.C. § 501 (c) (4). *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 215. Following this distinc-

Markley *v.* State Elections Enforcement Commission

tion, the United States Supreme Court held in *Alliance for Open Society International* that the congressional requirement that recipients of Leadership Act funds for HIV/AIDS prevention adopt formal policies opposing prostitution was unconstitutional because it had effects beyond the federal program by functioning as an "ongoing condition on recipients' speech and activities, [and] a ground for terminating a grant after selection is complete." Id., 217–18; see id., 208. Thus, the case was "not about the [g]overnment's ability to enlist the assistance of those with whom it already agrees. It [was] about compelling a grant recipient to adopt a particular belief as a condition of funding." Id., 218; see id., 211, 219 (The court rejected the government's reliance on an affiliation program that permitted funding recipients to work with affiliated organizations that do not abide by the Leadership Act requirements because that program did not alleviate first amendment concerns "when the condition is that a funding recipient espouse a specific belief as its own. If the affiliate is distinct from the recipient, the arrangement does not afford a means for the *recipient* to express *its* beliefs." (Emphasis in original.)).

Accordingly, we accept as a very general proposition that the unconstitutional conditions doctrine may permit the government to make otherwise problematic "[content based] distinctions when it subsidizes speech." *Davenport* v. *Washington Education Assn.*, 551 U.S. 177, 188–89, 127 S. Ct. 2372, 168 L. Ed. 2d 71 (2007); cf. *Reed* v. *Gilbert*, 576 U.S. 155, 169–71, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015) (content based regulations on speech are subject to strict scrutiny). Nevertheless, the United States Supreme Court's focus in *Alliance for Open Society International* on the effects of the condition both inside and outside of the governmental program is consistent with Professor Sunstein's oft cited rejection of an unconstitutional conditions model in which the concepts of " 'coercion' or 'penalty' " are

Markley *v.* State Elections Enforcement Commission

dispositive, in favor of "a highly particular, [constitutionally centered] model of reasons," which "asks whether, under the provision at issue, the government has constitutionally sufficient justifications for affecting constitutionally protected interests." C. Sunstein, supra, 70 B.U. L. Rev. 595; see id., 620–21 (urging "a more direct and [constitutionally grounded] inquiry into, first, the nature of the incursion on the relevant right, and second, the legitimacy and strength of the government's justifications for any such incursion"); see also R. Post, Essay, "Subsidized Speech," 106 Yale L.J. 151, 195 (1996) (evaluating constitutionality of conditions by "characteriz[ing] . . . speech . . . to determine the domain to which the subsidized speech at issue in a particular case should be assigned," with "regulations" on "public discourse" to be "subject . . . to the full array of constitutional constraints required by the domain in which the subsidized speech is located," and "internal directives to state officials dispensing subsidies" subject to less scrutiny).

A focus on the interests affected reveals that the government's ability to attach content based conditions on speech has particularly significant limitations with respect to distinctly private speech that is funded by the government, such as campaign messaging by candidates.[15] Like Professor Briffault, we find most illustra-

_____

[15] It is well established that the free speech clause of the first amendment applies only to "government regulation of private speech; it does not regulate government speech." *Pleasant Grove City* v. *Summum*, 555 U.S. 460, 467, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009). Although the line may be fine at times, particularly with regard to incumbents, it is similarly well established that speech by political candidates seeking office is inherently private in nature for purposes of the first amendment. See, e.g., *Campbell* v. *Reisch*, 986 F.3d 822, 825–27 (8th Cir. 2021) (discussing distinction, for purposes of constitutionality of blocking comments on social media page, between page maintained by candidate seeking office and page maintained by public official); see also *Garnier* v. *O'Connor-Ratcliff*, 41 F.4th 1158, 1174–77 (9th Cir. 2022) (citing cases from other federal courts of appeals as to state action with respect to public officials' social media pages), vacated, 601 U.S. 205, 144 S. Ct. 717, L. Ed. 2d (2024).

Markley *v.* State Elections Enforcement Commission

tive of this limitation the United States Supreme Court's decision in *Legal Services Corp.*, which considered a first amendment challenge to a restriction under the Legal Services Act that prevented attorneys for indigent clients, funded by the Legal Services Corporation (LSC), from "accept[ing] representations designed to change welfare laws, much less argu[ing] against the constitutionality or statutory validity of those laws." *Legal Services Corp.* v. *Velazquez*, supra, 531 U.S. 538–39; see, e.g., R. Briffault, supra, 35 Ind. L. Rev. 829–33. Concluding that *Rust* v. *Sullivan*, supra, 500 U.S. 173, provided no support for that restriction, the court observed that "the LSC program was designed to facilitate private speech, not to promote a governmental message. Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients. In the specific context of . . . suits for benefits, an LSC-funded attorney speaks on the behalf of the client in a claim against the government for welfare benefits. The lawyer is not the government's speaker." *Legal Services Corp.* v. *Velazquez*, supra, 542. The court held that this condition on the LSC grant constituted viewpoint discrimination that violated the first amendment. See id., 547.

In its analysis, the United States Supreme Court acknowledged that, "[w]hen the government creates a limited forum for speech, certain restrictions may be necessary to define the limits and purposes of the program. . . . The same is true when the government establishes a subsidy for specified ends." (Citations omitted.) Id., 543. Observing that the subsidies to LSC are intended "to facilitate suits for benefits by using the state and federal courts and the independent bar on which those courts depend," the court stated that "the program presumes that private, nongovernmental speech is necessary, and a substantial restriction is placed [on] that speech." Id., 544. The court noted that "[r]estricting LSC attorneys in advising their clients and

Markley *v.* State Elections Enforcement Commission

in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys . . . .''[16] Id.; see id., 545–46 (noting separation of powers concerns created by restriction). In concluding that this restriction violated the first amendment, the court rejected the government's claim that the restriction was "necessary to define the scope and contours of the federal program" by "ensur[ing] [that] funds can be spent for those cases most immediate to congressional concern," namely, "simple suits for benefits," not "complex challenges to existing welfare laws." Id., 547. As the court emphasized more than one decade later in *Alliance for Open Society International*, it had held in *Legal Services Corp.* that "*Congress cannot recast a condition on funding as a mere definition*

---

[16] Although the United States Supreme Court decided *Legal Services Corp.* as a viewpoint discrimination case given the specific nature of the restriction imposed on the legal aid attorneys, we find instructive its analysis of the editorialization restrictions at issue in *Federal Communications Commission* v. *League of Women Voters of California*, supra, 468 U.S. 364. The court observed that the "private nature of the speech involved [in *Legal Services Corp.*], and the extent of LSC's regulation of private expression, [were] indicated further by the circumstance that the [g]overnment [sought] to use an existing medium of expression and to control it, in a class of cases, in ways [that] distort its usual functioning. [When] the government uses or attempts to regulate a particular medium, [the court has] been informed by its accepted usage in determining whether a particular restriction on speech is necessary for the program's purposes and limitations." *Legal Services Corp.* v. *Velazquez*, supra, 531 U.S. 543; see *United States* v. *American Library Assn., Inc.*, 539 U.S. 194, 201–202, 213, 123 S. Ct. 2297, 156 L. Ed. 2d 221 (2003) (plurality opinion) (distinguishing *Legal Services Corp.*, in concluding that federal statute requiring installation of filtering software on public library computers as condition of receiving federal funds did not violate first amendment because public libraries do not have "[a] role that pits them against the [g]overnment, and there is no comparable assumption that they must be free of any conditions that their benefactors might attach to the use of donated funds or other assistance"); R. Briffault, supra, 35 Ind. L. Rev. 843 ("[a] restrictive speech constraint raises the specter of an unconstitutional governmental effort to transform a 'medium of expression' by driving discussion of political and legal issues out of an electoral process in which political and legal issues may be central to voter [decision making]").

Markley *v.* State Elections Enforcement Commission

*of its program in every case, lest the [f]irst [a]mendment be reduced to a simple semantic exercise.* Here, notwithstanding Congress' purpose to confine and limit its program, the restriction operates to insulate current welfare laws from constitutional scrutiny and certain other legal challenges, a condition implicating central [f]irst [a]mendment concerns." (Emphasis added.) *Legal Services Corp.* v. *Velazquez*, supra, 531 U.S. 547; see *Agency for International Development* v. *Alliance for Open Society International, Inc.*, supra, 570 U.S. 215.

2

### Application of Unconstitutional Conditions Principles to Public Financing

In our view, precluding the use of public funds to mention another candidate in a different race as a rhetorical device is akin to the restriction on welfare challenges at issue in *Legal Services Corp.*, insofar as both involve content based restrictions on government funded private speech that operate to limit the communication strategies of those who take advantage of the forum provided by those funds.[17] See R. Briffault, supra, 35 Ind. L. Rev. 822 (speech and civility code applicable to publicly funded judicial candidates would change content of first amendment political speech, creating first amendment violation). But see *Montoya* v. *Her-*

---

[17] We recognize that there is authority strictly limiting the import of *Legal Services Corp.* to viewpoint discrimination. See *Legal Aid Services of Oregon* v. *Legal Services Corp.*, 608 F.3d 1084, 1095 (9th Cir. 2010) (upholding restriction precluding use of legal services funds for soliciting clients, participating in class actions, and lobbying because that restriction "did not discriminate against any particular viewpoint or motivating ideology" but, instead, "limit[ed] specific procedural tools and strategies that grantee attorneys may utilize in the course of carrying out their legal advocacy"). We see that as a distinction only with respect to the degree of the incursion on the first amendment right. See R. Briffault, supra, 35 Ind. L. Rev. 822. Thus, *Legal Services Corp.* is instructive to the extent that it identifies a first amendment interest in content, and we go on to consider whether that content restriction may be justified by a compelling governmental interest.

Markley *v.* State Elections Enforcement Commission

*rera*, 276 P.3d 952, 958 (N.M. 2012) (noting that expenditure limitations imposed by state public financing act were "completely unrelated to the content of the candidate's speech" in concluding that act's "restriction on campaign contributions [was] not a method for restricting speech"). Because public financing program regulations that restrict political expression operate to burden candidates' core first amendment speech, we apply strict scrutiny and look beyond voluntariness to determine whether they are "narrowly tailored" to achieve "the traditional goals of public funding," namely, (1) promoting participation in the program, (2) "reducing fundraising burdens and the corrupting effects of contributions and the pursuit of contributions on government [decision making]," (3) facilitating candidate communications with the electorate, and (4) protecting the fiscal integrity of the program. R. Briffault, supra, 35 Ind. L. Rev. 828–29; see *Corren* v. *Condos*, supra, 898 F.3d 222 n.6 (stating in dictum that court would apply "the applicable level of scrutiny" to condition that burdened candidate's rights); L. Mayer, supra, 46 Conn. L. Rev. 1060–62 (urging application of strict scrutiny to funding conditions that burden free speech, with condition narrowly tailored to achieve compelling state interest); see also *Reed* v. *Gilbert*, supra, 576 U.S. 171 ("[content based] restrictions on speech . . . can stand only if they survive strict scrutiny, which requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest" (internal quotation marks omitted)); *Pursuing America's Greatness* v. *Federal Election Commission*, 831 F.3d 500, 510–512 (D.C. Cir. 2016) (federal election regulation banning unauthorized political action committees from using candidate's name in title of website or social media page was content based regulation subject to strict scrutiny and was not narrowly tailored to achieve asserted compelling governmental interest of preventing "voter confusion").

Markley *v.* State Elections Enforcement Commission

We now turn to the nature of the restriction at issue in this case. As the parties discussed in their briefs and at oral argument before this court, it is essential for candidates to be able to communicate where they stand on issues in relation to other candidates and public officials. The invocation by name of prominent political figures—some of whom may happen to be candidates elsewhere on the ballot in a particular election—will sometimes provide the most meaningful and effective way for a candidate to explain to voters their political ideals, policy commitments, and the values that they hope to bring to the office that they seek. Being able to categorize oneself as, for example, an opponent of the "Biden Democrats" or the "Trump Republicans" is of unquestionable rhetorical value to a candidate seeking office in polarized times. This is particularly so for state legislative races, such as those at issue in this case, in which the plaintiffs' communications invoke principles of Civics 101 in emphasizing their role as a check and balance on the executive branch, and particularly their opposition to the policies that had become synonymous in the public discourse with the political agenda associated with Governor Malloy.

Although references to other political figures, including those who may also be candidates in different races, may be of great rhetorical importance, we also conclude that the commission may apply the "direct furtherance" standard, as articulated in its Advisory Opinion, to preclude publicly funded candidates from using committee funds to "[promote] the defeat of or [attack] a candidate [who] is not a direct opponent of the candidate sponsoring the communication, but is in a different race . . . ." That restriction is not by itself facially an unconstitutional condition in violation of the first amendment insofar as it is integral to the governmental spending program because it ensures that public moneys are

Markley *v.* State Elections Enforcement Commission

spent only on qualifying campaigns without exceeding the amount of the grant allotted per race. See General Statutes § 9-702 (c). As the commission argues, protecting the state fisc via preventing the circumvention of spending and eligibility limitations presents a compelling governmental interest to support the restriction.[18] See *Federal Election Commission* v. *Colorado Republican Federal Campaign Committee*, supra, 533 U.S. 437, 456 (concluding that "[the] circumvention of valid contribution limits . . . is a valid theory of corruption" in sustaining coordinate spending limit appli-

---

[18] The commission contends that euphemisms can be substituted for direct references to Governor Malloy and that financial workarounds can be implemented, such as sharing the cost of the portions of the campaign messaging that pertain to Governor Malloy with an entity such as a town or state party committee, or the campaign of Governor Malloy's opponent. Providing workarounds to avoid the negative effect of a campaign finance law through adjusting messaging does not, without more, save the law from violating the first amendment because compelling such is itself content discrimination and "contravenes the fundamental rule of protection under the [f]irst [a]mendment, that a speaker has the autonomy to choose the content of his own message." (Internal quotation marks omitted.) *Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, supra, 564 U.S. 739; see *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 477 n.9 (opinion announcing judgment) (that speakers may avoid burdens of law "by changing what they say" does not render law compliant with first amendment). This is particularly so in public financing cases in which the candidate committee's spending is subject to an overall cap, meaning that the public funds necessarily affect the amount of the funds available for the otherwise impermissible communication. See R. Briffault, supra, 35 Ind. L. Rev. 832–33; see also General Statutes § 9-702 (c) (setting forth overall limitations on expenditures in general and primary elections under program). Indeed, the ease of circumvention undercuts the constitutional viability of a restriction. See *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 364 (precedent allowing restrictions on independent political expenditures by labor unions and for-profit corporations was not supported by compelling governmental interests because it was "undermined by experience since its announcement"). The availability of such workarounds, however, is relevant in determining whether the restriction is in fact sufficiently narrowly drawn to advance the asserted governmental interest. See D. Warren, Note, "My Way and/or the Highway: Exploring the 'Adequacy' of the Alternative Channels Test in Conditional Speech Cases," 11 First Amend. L. Rev. 636, 688–89 (2013) (urging courts to consider presence of alternative channels separate from initial "constitutional deficiency of the speech restriction" to determine whether it survives heightened scrutiny).

Markley *v.* State Elections Enforcement Commission

cable to political parties under FECA); *Corren* v. *Condos*, supra, 898 F.3d 223 (restriction of private contributions to publicly funded candidates is supported by compelling state interest because, "if such contributions were not limited, grants of public funds would simply serve as stipends to candidates who would continue private fundraising efforts and thereby reintroduce the detriments of private fundraising that public election financing schemes were designed to avoid"); *Republican National Committee* v. *Federal Election Commission*, supra, 487 F. Supp. 285–86 (dictum emphasizing that "reasonable limits and conditions" on "the expenditure of public funds are necessary to the effectiveness of a [public financing] program"). We also conclude, however, that, if the "direct furtherance" standard is applied in a way that muzzles publicly funded candidates' political speech beyond that necessary to prevent the funding of campaign speech with respect to a clearly identified candidate running in a different race, it is a content based restriction that is an unconstitutional condition in violation of the first amendment. That line is marked by the "functional equivalent of express advocacy" test articulated in Chief Justice Roberts' opinion in *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 469–70.

II

APPLICATION OF THE "FUNCTIONAL EQUIVALENT
OF EXPRESS ADVOCACY" TEST TO DETERMINE
WHETHER CAMPAIGN SPEECH REFERRING
TO A CANDIDATE IN A DIFFERENT
RACE IS PROPERLY SUBJECT
TO RESTRICTIONS

In determining whether campaign messaging by a publicly funded candidate who uses the name of a candidate for a different office as a rhetorical device to refer

Markley *v.* State Elections Enforcement Commission

to a set of policies opposed (or supported) by the publicly funded candidate constitutes impermissible electoral communications, rather than a constitutionally protected message in "direct furtherance" of the publicly funded candidate's own campaign for office, we, like the trial court, find instructive the "functional equivalent of express advocacy" test articulated in Chief Justice Roberts' controlling opinion in *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 469–70 (opinion announcing judgment),[19] which builds on the analysis of *Buckley* v. *Valeo*, supra, 424 U.S. 1. The functional equivalent test arises from the regulatory distinction between permissible " 'issue discussion' " and prohibited " 'express advocacy' of a candidate's election or defeat,' " with respect to the constitutionally permissible reach of campaign finance laws as applied to corporate or labor union speech. (Internal quotation marks omitted.) *National Organization for Marriage* v. *McKee*, 649 F.3d 34, 52 (1st Cir. 2011), cert. denied, 565 U.S. 1234, 132 S. Ct. 1635, 182 L. Ed. 2d 233 (2012). As the United States Court of Appeals for the First Circuit has observed, the "division" between these concepts "has played an important, and at times confounding, role in a certain set of modern [United States] Supreme Court election law precedents. Though the contours (and significance) of the distinction have never been firmly fixed, the core premise is that regulation of speech expressly advocating a candidate's election or defeat may more easily survive constitutional scrutiny than regulation of speech discussing political issues more generally." Id. The United States Supreme Court initially embraced this standard in *Buck-*

---

[19] Although the United States Supreme Court's decision in *Wisconsin Right to Life* was sharply divided as to various points in that case, a majority of the court has subsequently described Chief Justice Roberts' opinion adopting the functional equivalent of express advocacy test for the as applied challenge in that case as "controlling" on that point. *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 332–33.

Markley *v.* State Elections Enforcement Commission

*ley* v. *Valeo*, supra, 424 U.S. 39–44, to determine whether a campaign spending restriction suffered from statutory "overbreadth—i.e., that statutes that reached issue discussion might be deemed to regulate impermissibly a substantial amount of speech protected by the [f]irst [a]mendment . . . ."[20] *National Organization for Marriage* v. *McKee*, supra, 53.

Specifically, in *Buckley*, the United States Supreme Court considered the constitutionality of § 608 (e) (1) of FECA, which had the "plain effect" of "prohibit[ing] all individuals, who are neither candidates nor owners of institutional press facilities, and all groups, except political parties and campaign organizations, from voicing their views *'relative to a clearly identified candidate'* through means that entail aggregate expenditures of more than [$1000] during a calendar year." (Emphasis added.) *Buckley* v. *Valeo*, supra, 424 U.S. 39–40. Addressing potential vagueness concerns, the court noted that the statute defined the terms "expenditure," "clearly identified," and "candidate,"; (internal quotation marks omitted) id., 41; but did not provide a "definition clarifying what expenditures are 'relative to' a candidate." Id. The court observed that, although the provision could be read for "the phrase 'relative to' a candidate . . . to mean 'advocating the election or defeat of' a candidate," this reading did not eliminate vagueness concerns because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application.

---

[20] We note that the First Circuit has questioned the long-term utility of the express advocacy/issue discussion distinction, insofar as it had been used to scrutinize limits on independent expenditures by corporations and unions, in the wake of the United States Supreme Court's decision in *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 310, "which held limitations on such expenditures by corporations and unions to be unconstitutional, and thus effectively prohibited any law limiting independent expenditures regardless of the identity of the regulated entity." *National Organization for Marriage* v. *McKee*, supra, 649 F.3d 54.

Markley *v.* State Elections Enforcement Commission

Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest." Id., 42.

Declining to import any subjective considerations of speaker intent, the United States Supreme Court emphasized that the risks of impinging free discussion could "be avoided only by reading § 608 (e) (1) as limited to communications that *include explicit words of advocacy of election or defeat of a candidate*, much as the definition of 'clearly identified' in § 608 (e) (2) requires that an explicit and unambiguous reference to the candidate appear as part of the communication." (Emphasis added.) Id., 43. Accordingly, the court "construed [the statute] to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office."[21] Id., 44. It elaborated that such "express words of advocacy of election or defeat" include words and phrases "such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' [and] 'reject.' " Id., 44 n.52; see footnote 23 of this opinion ("express words of advocacy" are known colloquially as "magic words" (internal quotation marks omitted)); see also *Buckley* v. *Valeo*, supra, 44–45 (concluding that federal act's "expenditure limitations impose far greater restraints on the freedom of speech and association than do its contribution limitations" and that "the gov-

---

[21] The United States Supreme Court noted that the statute defined "clearly identified to require that the candidate's name, photograph or drawing, or other unambiguous reference to his identity appear as part of the communication. Such other unambiguous reference would include use of the candidate's initials (e.g., FDR), the candidate's nickname (e.g., Ike), his office (e.g., the [p]resident or the [g]overnor of Iowa), or his status as a candidate (e.g., the Democratic [p]residential nominee, the senatorial candidate of the Republican Party of Georgia)." *Buckley* v. *Valeo*, supra, 424 U.S. 43–44 n.51.

Markley *v.* State Elections Enforcement Commission

ernmental interest in preventing corruption and the appearance of corruption is inadequate to justify § 608 (e) (1)'s ceiling on independent expenditures'').

Subsequently, in *Wisconsin Right to Life*, the United States Supreme Court considered an overbreadth challenge to § 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), 2 U.S.C. § 441b (b) (2), as applied to challenges to restrictions on federal campaign advertising. See *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 455–57 (opinion announcing judgment). Expanding on the logic of *Buckley*, the court, in a controlling opinion authored by Chief Justice Roberts, again declined to adopt a test that would "[turn] on the speaker's intent to affect an election,'' because that would be inconsistent with "our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'' (Internal quotation marks omitted.) Id., 467 (opinion announcing judgment). Emphasizing the importance of freedom of speech on matters of public concern without fear of penalty, Chief Justice Roberts' opinion held that "the proper standard for an as-applied challenge to BCRA § 203 must be objective, focusing on the substance of the communication rather than amorphous considerations of intent and effect. . . . It must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation. . . . And it must eschew the open-ended rough-and-tumble of factors, which invit[es] complex argument in a trial court and a virtually inevitable appeal. . . . *In short, it must give the benefit of any doubt to protecting rather than stifling speech.*''[22] (Citations omitted;

[22] Chief Justice Roberts further explained that "contextual factors . . . should seldom play a significant role in the [functional equivalent] inquiry. Courts need not ignore basic background information that may be necessary to put an ad in context—such as whether an ad describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future . . . but the need to consider

emphasis added; internal quotation marks omitted.) Id., 469 (opinion announcing judgment). Chief Justice Roberts wrote that, "[i]n light of these considerations, a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." Id., 469–70 (opinion announcing judgment). Acknowledging that "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application," Chief Justice Roberts emphasized that "[d]iscussion of issues cannot be suppressed simply because the issues may also be pertinent in an election. [When] the [f]irst [a]mendment is implicated, *the tie goes to the speaker, not the censor.*" (Emphasis added; internal quotation marks omitted.) Id., 474 (opinion announcing judgment).

Turning to the facts of *Wisconsin Right to Life*, Chief Justice Roberts applied this standard and concluded that the three advertisements at issue were "plainly not the functional equivalent of express advocacy." Id., 470 (opinion announcing judgment). Chief Justice Roberts observed: "First, their content is consistent with that of a genuine issue ad: The ads focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: The ads do not mention an election, candidacy, political party, or challenger; and they do not take a position on a candidate's character, qualifications, or fitness for office." Id.;

---

such background should not become an excuse for discovery or a broader inquiry of the sort [that] . . . raises [f]irst [a]mendment concerns." (Citation omitted; internal quotation marks omitted.) *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 473–74 (opinion announcing judgment).

Markley *v.* State Elections Enforcement Commission

see id., 473 (opinion announcing judgment) (concluding that advertisements were "issue ads," rather than election ads, when they stated Wisconsin senators' office contact information and positions on judicial nomination filibusters and provided hyperlink to website that contained election related materials, and noting that "[a]ny express advocacy on the [website], already one step removed from the text of the ads themselves, certainly does not render an interpretation of the ads as genuine issue ads unreasonable"); see also *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 324–26 (concluding that film, "Hillary," was "the functional equivalent of express advocacy" because it, "in essence, is a [feature length] negative advertisement that urges viewers to vote against Senator [Hillary Rodham] Clinton for President" through use of "historical footage, interviews with persons critical of her, and voiceover narration" targeted to her fitness for office); *Human Life of Washington Inc.* v. *Brumsickle*, 624 F.3d 990, 1015 (9th Cir. 2010) (The challenged advertisements, which did not mention the physician-assisted suicide ballot initiative by name, were "the functional equivalent of express advocacy" because their timing related to the pending referendum, and they were "susceptible of no reasonable interpretation other than as an urgent appeal to vote down the measure. The communications explicitly state that physician-assisted suicide has reentered the realm of public debate and that the situation demands action."), cert. denied, 562 U.S. 1217, 131 S. Ct. 1477, 179 L. Ed. 2d 302 (2011).

We emphasize that "careful judicial scrutiny" is required in determining whether a communication is " 'the functional equivalent of express advocacy' " because the United States Supreme Court intended that standard, which "has the potential to trammel vital political speech," to provide "clear notice as to what communications could be regulated, thereby ensuring that politi-

Markley *v.* State Elections Enforcement Commission

cal expression would not be chilled." *North Carolina Right to Life, Inc.* v. *Leake*, 525 F.3d 274, 283–84 (4th Cir. 2008). We also recognize that the timing of the communications is not, without more, a significant contextual factor in the analysis because "[t]hat the ads were run close to an election is unremarkable" when, as in Connecticut, "[e]*very* ad covered by [the statute] will by definition air just before a primary or [a] general election." (Emphasis in original.) *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 472 (opinion announcing judgment); see General Statutes § 9-601b (b) (7) (A) (excluding from definition of "expenditure" those communications made "prior to the ninety-day period preceding" applicable election or primary). This, of course, renders *Buckley*'s still critical "magic words" paradigm of even greater significance in the analysis in this case.[23] M. Kasper, "Magic Words

---

[23] Indeed, commentators have observed that the *Buckley* test, which identifies specific trigger words that indicate a communication is electioneering rather than issue related, remains instructive because it is only modestly different in scope and application from the functional equivalent test that the United States Supreme Court later applied in *Wisconsin Right to Life*. See R. Briffault, "*WRTL II*: The Sharpest Turn in Campaign Finance's Long and Winding Road," 1 Alb. Government L. Rev. 101, 123 (2008) (describing functional equivalent test as "vague and uncertain" with effect of "modestly increas[ing] the constitutionally permissible scope of regulation" compared to "*Buckley*'s magic words test"); R. Esenberg, "The Lonely Death of Public Campaign Financing," 33 Harv. J.L. & Pub. Policy 283, 309–10 (2010) (although "the [United States Supreme] Court does not explicitly return to the regime of magic words, it should not be difficult for advertisers to frame election cycle communications as 'genuine issue advocacy' " because *Wisconsin Right to Life* "creates a rather large safe harbor for independent expenditures mentioning candidates but purporting to focus on issues"); R. Hasen, "Beyond Incoherence: The Roberts Court's Deregulatory Turn in *FEC* v. *Wisconsin Right to Life*," 92 Minn. L. Rev. 1064, 1103 (2008) ("In sum, the [*Wisconsin Right to Life*] principal opinion's test separating the functional equivalent of express advocacy, which must be paid for by corporate or union [political action committee] funds, from genuine issue advocacy, which may be paid for from corporate or union treasury funds, provides a broad safe harbor for corporations and unions. It allows them to spend large sums seeking to influence the outcome of elections. Though there are line-drawing problems that may vex academics and courts, corporations and unions can safely stay within the limits of the law and still run ads

and Millionaires: The Supreme Court's Assault on Campaign Funding,'' 42 J. Marshall L. Rev. 1, 21 (2008); see footnote 23 of this opinion.

Turning to the record in this case, we note that our review of three of the five communications at issue, namely, exhibits 2, 3, and 6 before the commission, reveals nothing that renders them the functional equivalent of express advocacy or campaign speech with respect to Governor Malloy, who it is undisputed is a "clearly identified" candidate within the meaning of the regulatory scheme. First, and most significant, they lack any of *Buckley*'s magic words, namely, express references to the ongoing election with respect to Governor Malloy; they do not suggest that a vote for Mazurek would be tantamount to a vote for Governor Malloy or Democratic policies. See *Buckley* v. *Valeo*, supra, 424 U.S. 44 n.52. To be sure, none is complimentary of Governor Malloy or the policies that he supported. Nevertheless, none indicates in any way that Governor Malloy was running for reelection in 2014, or that support for the plaintiffs would be integral to defeating the candidacy of Governor Malloy or any other Democrat seeking office. Rather, they are phrased in a way that appears to view the political control of Governor Malloy and his Democratic allies in Hartford as a given; they highlight the plaintiffs' role as a legislative check and balance against policies endorsed by Governor Malloy and his Democratic allies. Put differently, these three advertisements do not convey a different meaning in

likely to affect and intended to affect the outcome of elections.''); M. Kasper, "Magic Words and Millionaires: The Supreme Court's Assault on Campaign Funding,'' 42 J. Marshall L. Rev. 1, 21 (2008) ("In the end, issue ads have come full circle. Under *Buckley*, a corporation or union could run issue ads and escape FECA by simply avoiding the magic words, regardless of how blunt the electioneering message. . . . But after [*Wisconsin Right to Life*], we are back where we started. In order to escape FECA and BCRA, a corporation or union need only avoid the magic words (the old and the new), and, it appears, any character assassination.'').

Markley *v.* State Elections Enforcement Commission

2014, when Governor Malloy was running for reelection as an incumbent, than they would have in 2012 or 2016, when he was simply in office as the sitting governor; they are not addressed at all to the ongoing gubernatorial election. Thus, timing aside—which necessarily coincides with the timing of the plaintiffs' own election—we cannot conclude that these communications are "susceptible of no reasonable interpretation other than as an appeal to vote . . . against" Governor Malloy. *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 470 (opinion announcing judgment).

The communications admitted into evidence as exhibits 4 and 5 before the commission present a closer question with respect to whether they were the functional equivalent of express advocacy with respect to Governor Malloy's reelection. Both used words somewhat evocative of an ongoing negative campaign against Governor Malloy, which was supported by Sampson. In addition to highlighting Sampson's legislative role, the third communication, exhibit 4 before the commission, highlights Sampson's desire for a "[*n*]*ew* [d]irection" and expressly implores voters to "*change course* and STOP Governor Malloy and the majority Democrats' dangerous agenda," and both of those statements appear to advocate change in a way that might seem out of place for an incumbent candidate seeking reelection. (Emphasis added.) This communication, however, also might reasonably be understood as urging electoral resistance—in the form of Sampson—to the leadership and initiatives of Governor Malloy and his legislative allies. The fourth communication, exhibit 5 before the commission, is generally an attack on Mazurek's legislative record during his prior service as a state representative, but it refers expressly to Governor Malloy's "campaign for [g]overnor" in criticizing Mazurek's vote on Public Acts, Spec. Sess., July, 2010, No. 10-1 (Spec.

349 Conn. 67 MAY, 2024 119

Markley *v.* State Elections Enforcement Commission

Sess. P.A. 10-1),[24] observing that it gave Governor Malloy's campaign "an additional $3 million dollars" via a general increase in public finance grant amounts. With the election cycle timing not a significant factor in the analysis, an isolated mention of a Malloy "campaign" in the context of the other criticisms of his policies is not the functional equivalent of campaign speech. Moreover, to the extent that the oblique references to "change" and a "campaign" in these communications may in some way be understood to be the functional equivalent of express advocacy, "the tie goes to the speaker," namely, the plaintiffs. *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 551 U.S. 474 (opinion announcing judgment); see, e.g., *Citizens United* v. *Federal Election Commission*, supra, 558 U.S. 367–68; *Federal Election Commission* v. *Wisconsin Right to Life, Inc.*, supra, 472 (opinion announcing judgment); *Buckley* v. *Valeo*, supra, 424 U.S. 44 n.52. Accordingly, we conclude that the trial court improperly dismissed the plaintiffs' administrative appeal from the decision of the commission.

The judgment is reversed and the case is remanded to the trial court with direction to sustain the plaintiffs' administrative appeal.

In this opinion the other justices concurred.

---

[24] We note that Spec. Sess. P.A. 10-1, "An Act Concerning Clean Elections," made myriad changes to the state election laws, including amending General Statutes § 9-705 to double the major party gubernatorial election grant from $3 million to $6 million. See Spec. Sess. P.A. 10-1, § 3. Mazurek initially voted against the bill enacted as Spec. Sess. P.A. 10-1, and he changed his vote to override a gubernatorial veto of that bill. See Senate Bill No. 551, July, 2010 Spec. Sess.